**FILED**
MAY 10 2016
Clerk, U.S. District and Bankruptcy Courts

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

TAMECKA MERRICK,
On behalf of
RONALD WASHINGTON
2918 S St. SE
Washington, D.C. 20020

    Plaintiff,

    v.

DISTRICT OF COLUMBIA,
A Municipal Corporation
One Judicial Square
441 Fourth Street, N.W.
Washington, D.C. 20001

to serve:

MURIEL BOWSER, MAYOR
District of Columbia
441 4th St. N.W., 11th Fl.
Washington, D.C. 20002

KARL A. RACINE
ATTORNEY GENERAL
District of Columbia
441 4th Street, N.W., 11th Fl.
Washington, D.C. 20002

    Defendant.

Case: 1:16-cv-00888   Jury Demand
Assigned To : Jackson, Amy Berman
Assign. Date : 5/10/2016
Description: TRO/PI  (D Deck)

**RECEIVED**
MAY - 9 2016
Clerk, U.S. District & Bankruptcy Courts for the District of Columbia

## COMPLAINT

This is an action for relief under the Individuals with Disabilities Education Improvement Act ("IDEA") and the American with Disabilities Act ("ADA"). Since November 28, 2015, Plaintiff's son Ronald Washington ("Mr. Washington"),[1] who is profoundly deaf and emotionally disturbed, has been detained at the District of Columbia's Youth Services Center which is incapable of implementing his individualized education program. As a result, Mr.

---

1 Mr. Washington has executed an educational power of attorney pursuant to D.C. Code § 38-2571.04(a)(3)(A) designating his mother, Tamecka Merrick, as his agent to make educational decisions and participate in procedures under the IDEA. Pursuant to this authority, Ms. Merrick brings the instant action on Mr. Washington's behalf.

Washington has been. and will continue to be, denied a free appropriate public education including instruction and counseling in American Sign Language as long as he remains at YSC.

## JURISDICTION

1. This Court has jurisdiction pursuant to the Individuals with Disabilities Education Improvement Act, 20 U.S.C §§ 1400-1461 (West 2004), as amended in 2004, 28 U.S.C. § 1331, and 5 D.C.M.R. § 3000.1 et seq. (West 2013). This Court also has supplemental jurisdiction pursuant to 28 U.S.C § 1367.

2. Declaratory relief is authorized by 28 U.S.C §§ 2201, 2202.

3. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the events giving rise to the claims occurred in the District of Columbia.

## PARTIES

4. Plaintiff's son Ronald Washington ("Mr. Washington") is a student with disabilities who has been identified as eligible for special education and related services under the IDEA by the District of Columbia Public School System ("DCPS"). For the 2015-16 school year, he will repeated the ninth grade for the third time. Mr. Washington is profoundly deaf and is only able to communicate in American Sign Language.

5. Defendant, the District of Columbia Government, is a municipal corporation that receives federal funds pursuant to the IDEA, to ensure access to a free and appropriate public education ("FAPE") to all children until twenty-one years of age under federal law and twenty-two years of age under the local law, and is obligated to comply with the applicable federal regulations and statutes including but not limited to the IDEA. The District of Columbia Public Schools ("DCPS") and the Office of the State Superintendent for Education ("OSSE") are *non sui juris* of the District of Columbia. DCPS serves as the local education agency ("LEA") of Youth Services Center ("YSC")

and is responsible for ensuring that YSC complied with all aspects of the IDEA.

## FACTUAL BACKGROUND

6. Mr. Washington is a nineteen (19) year-old student with disabilities who is currently detained at Youth Services Center ("YSC").

7. Mr. Washington is deaf and must communicate in American Sign Language ("ASL"). However, a psychological evaluation conducted in February of 2016 found that "Mr. Washington's level of receptive and expressive language skills are below the level expected for a deaf adult. . . . [Mr. Washington] lacked awareness of basic factual information that an adult his age (whether deaf or hearing) generally knows." As a consequence, his ability to communicate in ASL—his first language—is severely limited.

8. According to his most recent IEP, Mr. Washington's reading comprehension is on part with that of a child half way through the first grade, approximately that of a seven year-old.

9. In addition, Mr. Washington is emotionally disturbed which impairs his ability to communicate in ASL. The IEP reveals that Mr. Washington's emotional disturbance manifests through high sensitivity "to facial expression and body language which can often cause agitation and misunderstanding, more so than the average Deaf person."

10. In 2012, Mr. Washington was committed to the custody of DYRS until his twenty-first birthday.

11. On August 2, 2013, Mr. Washington filed a due process complaint alleging that DCPS denied him a FAPE.

12. On October 16, 2013, Hearing Officer Kimm Massey issued a Hearing Officer's Decision finding in Mr. Washington's favor. The Hearing Officer found that as a result

of DCPS' denials of FAPE, "Mr. Washington's ASL and academic skills remain below level, his emotional and social development issues have been exacerbated, he has received juvenile charges during time period when he should have been in school, and his misbehavior has increased to the point where he has had to be placed in psychiatric hospitalization." (HOD at 11.)

13. On December 23, 2013, Mr. Washington was enrolled in the Vermont Center for the Deaf and Hard of Hearing, Inc.

14. On March 25, 2014, Mr. Washington was discharged from the Vermont Center after damaging numerous computers, a plant, a television, and a window in his classroom.

15. On July 14, 2014, Mr. Washington was admitted into Desert Hills Youth and Family Center Services of New Mexico, Inc. He was abruptly discharged on August 20, 2014 for actions relating to numerous assaults.

16. On November 7, 2014, Mr. Washington was admitted into Preparatory School of the National Deaf Academy in Mount Dora, Florida. He was discharged in June of 2015.

17. On June 5, 2015, Mr. Washington was admitted to New Beginnings Vocational Program. He was permanently suspended from the program on October 8, 2015

18. On November 28, 2015, Mr. Washington was detained at YSC. He has remained there since.

19. On December 17, 2015, an individualized education program ("IEP") was developed for Mr. Washington.

20. The IEP required that Mr. Washington receive twenty-five hours per week of specialized instruction outside of the general education setting and three (3) hours per week of behavioral support services outside the general education setting. The IEP also specified that Mr. Washington "will have an ASL [American Sign Language] teacher and

behavioral specialist for his classes within a residential school for the Deaf and/or Residential Treatment Center only."

21. The IEP explains that "[t]his student requires a 1:3 staff [to] student ratio for group instruction and socialization."

22. Most importantly, the IEP mandated that Mr. Washington "continues to require instructional delivery with staff and teachers using American Sign Language."

23. Additionally, the IEP meeting notes reflected the IEP team's finding that "[Mr. Washington] needs to be engulfed in the deaf community."

24. YSC is a general education setting with a single classroom where all students of all ages receive instruction at the same time. As a result, YSC is unable to provide any specialized instruction or related services outside of the general education setting.

25. Moreover, YSC's staff are not fluent in American Sign Language and YSC does not employ a teacher capable of providing specialized instruction in American Sign Language.

26. Instead, Mr. Washington is instructed through an interpreter in violation of his IEP. The primary difference between instructional delivery in ASL and the use of an interpreter is the teacher or related service provider is actually providing the instruction or services in ASL. When an interpreter is used, Mr. Washington is forced to look at the teacher, then look at the translator, then try to record notes—thereby comprising an entirely different, and more onerous, educational experience.

27. Indeed, the hearing officer found in the 2013 HOD that, "Student finds it easier to learn from teachers who use sign language. When the teacher does not sign and Student has to rely upon an interpreter, Student has to constantly look back and forth between the interpreter and the teacher, which gets tiring and makes it hard to take notes."

28. Echoing these findings, the February 2016 evaluation found that "Mr. Washington should be placed in an academic setting that allows him to exposure to other deaf students and academic instruction *directly in ASL*." (Emphasis added.)

29. Though Mr. Washington is sometimes able to convey general ideas to staff using hand gestures, he is unable to fully understand what staff and other individuals are saying to him and is unable to convey anything but the most basic ideas and needs without the assistance of interpreters.

30. On March 1, 2016, Mr. Washington was accepted to the American School for the Deaf's residential education program which all parties agree can implement his IEP. The acceptance letter stated that the school expected Mr. Washington to begin attending on March 21, 2016.

31. On March 18, 2016, Judge Kimberly Knowles of the District of Columbia Superior Court issued an order authorizing Mr. Washington's placement at the American School for the Deaf pursuant to the Interstate Compact on the Placement of Children ("ICPC").

32. At some point in time, a dispute arose between the Office of the State Superintendent for Education ("OSSE"), DYRS, and Health Services for Children with Special Needs, Inc. ("HSCSN") over who will pay for what components of Mr. Washington's placement.

33. As a result, Mr. Washington remains and will remain in YSC where his IEP cannot be implemented.

34. On May 6, 2016, Mr. Washington filed a due process complaint against the District of Columbia Public Schools ("DCPS") challenging his current IEP and placement.

6

35. As a consequence of the District's failure to provide appropriate services to Mr. Washington, Mr. Washington is unable to benefit from the programs and services offered at YSC, including his right to a FAPE.

36. In addition, Mr. Washington's confinement in a setting where he is the only deaf student has inflicted serious emotional distress and has caused him to feel humiliated and isolated.

## CLAIMS FOR RELIEF

### Claim I: Violation of the IDEA's Stay Put Provision

37. Once an adult student has filed a due process complaint alleging a denial of FAPE, the student "shall remain in the then-current educational placement of the child." *Douglas v. District of Columbia*, 4 F.Supp.3d 1, 2 (D.D.C. 2013)(quoting 20 U.S.C. § 1415(j)). "To invoke stay-put, a student or his parent need only show that the school system "proposes a 'fundamental change in, or elimination of, a basic element of the [then-current educational placement]." *Douglas*, 4 F.Supp.3d at 2 (quoting *District of Columbia v. Vinyard*, 901 F.Supp.2d 77, 83 (D.D.C. 2012)).

38. The District has effected a fundamental change in Mr. Washington's placement in two ways.

39. First, Mr. Washington's IEP requires that he receive all hours of specialized instruction and services outside of the general education setting. This means that Mr. Washington cannot be exposed to non-disabled peers at any point in time during the school day. YSC is incapable of providing *any* hours of instruction or services outside of the general education setting because all students of all ages are educated in the same room. Because YSC's physical layout exposes Mr. Washington to his non-disabled peers during all hours of instruction. Exposing a student who requires all instruction outside of the

7

general education setting to his or her non-disabled peers constitutes a fundamental change in placement and violates the IDEA's stay put provision. *G.B. v. District of Columbia*, 78 F.Supp.3d 109, 115 (D.D.C. 2015).

40. Second, Mr. Washington's IEP mandates that Mr. Washington receive direct instruction in ASL because Mr. Washington's first language is ASL, not English. This requires that his teachers actually teach in ASL, and therefore be fluent in ASL themselves, rather than teacher through ASL interpreters. YSC does not have *any* special education teachers who are fluent in ASL. Moreover, the IDEA states that only highly qualified educators—i.e. individuals who are certified special education teachers under state certification standards—are able to provide specialized instruction. *See* 34 C.F.R. § 300.220 (the District must ensure "that each person employed as a public school special education teacher . . . is highly qualified as a special education teacher . . . ."). In contrast, paraprofessionals like ASL interpreters cannot directly provide specialized instruction and using paraprofessionals to provide specialized instruction constitutes a fundamental change in placement. *See G.B.*, 78 F.Supp.3d 115 ("the IDEA does not permit paraprofessionals to provide specialized instruction or related services without the supervision of a special education teacher.")

41. Because Mr. Washington has a proceeding under the IDEA pending before the Office of Dispute Resolution and DCPS has effected a fundamental change in placement by virtue of failing to provide 1) instruction outside of the general education setting and 2) direct instruction in ASL, the IDEA's stay put provision has been triggered. Consequently, the District is currently violating Mr. Washington's stay put rights.

42. In order to remedy this violation, Mr. Washington respectfully requests that the Court order the District to (1) immediately fund Mr. Washington's placement at the American

School for the Deaf through OSSE and (2) immediately transfer Mr. Washington to the American School for the Deaf.

Claim II: Violation of Title II's Effective Communication Provision

43. Under Title II of the Americans with Disabilities Act ("ADA"), "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such entity." 42 U.S.C. § 12132. Title II requires that public entities provide accommodations that give individuals with disabilities the same opportunity to participate in or benefit from a service as that which is afforded to persons without disabilities. 28 C.F.R. § 35.130(b)(1)(ii)(2014); *Pierce v. District of Columbia*, 128 F.Supp.250 266-67 (D.D.C. 2015).

44. In order to prevail on a claim under the ADA, Mr. Washington must show that (1) he is a qualified individual with a disability, (2) that the District denied him the benefits of or prohibited her from participating in the entity's services, programs, or activities, and (3) that denial or prohibition was "by reason of" his disability. *Alston v. District of Columbia*, 561 F.Supp.2d 29, 37 (D.D.C. 2008).

45. Mr. Washington is a qualified individual with a disability because he is profoundly deaf and entitled to special education and related services. Mr. Washington has been denied the benefits of receiving educational services because he requires direct instruction in ASL in order to benefit and the District refuses to provide direct instruction in ASL. The District has denied Mr. Washington the benefit of educational services solely because he requires accommodation in the form of direct instruction provided by a highly qualified educator who is also fluent in ASL in a segregated setting. But for Mr. Washington's disabilities which require that he receive direct specialized instruction outside the

general education setting, Mr. Washington would be receiving the benefit of educational services provided by the District.

Claim III: Violation of the District of Columbia Human Rights Act

46. This Court can consider claims of discrimination under the District of Columbia Human Rights Act ("DCHRA") under the same framework as the ADA. *See Badwal v. Bd. of Trustees of Univ. of Dist. of Columbia*, Civ No. 12-2073 (KBJ), 2015 WL 5692842, at *6 (D.D.C. 2015) (analyzing DCHRA claims using an ADA analysis).

47. Accordingly, in order to prevail on a claim under the ADA, Mr. Washington must show that (1) he is a qualified individual with a disability, (2) that the District denied him the benefits of or prohibited her from participating in the entity's services, programs, or activities, and (3) that denial or prohibition was "by reason of" his disability. *See Alston*, 561 F.Supp.2d at 37.

48. Mr. Washington is a qualified individual with a disability because he is profoundly deaf and entitled to special education and related services. Mr. Washington has been denied the benefits of receiving educational services because he requires direct instruction in ASL in order to benefit and the District refuses to provide direct instruction in ASL. The District has denied Mr. Washington the benefit of educational services solely because he requires accommodation in the form of direct instruction provided by a highly qualified educator who is also fluent in ASL in a segregated setting. But for Mr. Washington's disabilities which require that he receive direct specialized instruction outside the general education setting, Mr. Washington would be receiving the benefit of educational services provided by the District.

WHEREFORE, the Plaintiff prays that this Court:

1. Order the District to immediately place and fund Mr. Washington at the American School for the Deaf through OSSE;

2. Declare that the actions of the District of Columbia, as alleged herein, violated Mr. Washington's rights under the Americans with Disabilities Act;

3. Enter judgment awarding Mr. Washington damages against the District of Columbia in an amount appropriate to the evidence adduced at trial;

4. Award Plaintiff's attorney fees and costs of this action;

5. Award any other relief that the Court deems just and proper.

Respectfully submitted,

Stevie Nabors [1016291]
Charles Moran [970871]
1220 L St NW, Suite 700
Washington, D.C. 20005
(202) 742-2056
steve.nabors@camoranlaw.com
charles.moran@camoranlaw.com

May 9, 2016